KATHRYN C. WANNER (Cal. Bar No. 269310)
Email: wannerk@sec.gov
MARC BLAU (Cal. Bar No. 198162)
Email: blaum@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brent Wilner, Associate Director
Douglas M. Miller, Supervisory Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>     vs.<br><br>MARCO G. SANTARELLI,<br><br>          Defendant. | Case No. 8:25-cv-02375<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of

business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Defendant Marco Santarelli ("Santarelli"), resides in this district.

## SUMMARY

4. From in or about June 2020 through in or about June 2024, Marco G. Santarelli ("Santarelli") used his company Norada Capital Management, LLC ("Norada") to fraudulently raise tens of millions of dollars from hundreds of investors nationwide by offering them unsecured, high-yield Norada promissory notes that he eventually could only repay by using other investor funds (*i.e.*, a Ponzi scheme).

5. To lure investors into the scheme, Santarelli falsely told investors that Norada would invest in assets with "high cash-flow or future cash-flow potential" and "strong capital preservation potential." Santarelli also falsely told investors that these assets were an appropriate investment for retirement.

6. Contrary to Santarelli's representations to investors, however, Norada's portfolio largely consisted of volatile and speculative investments.

7. Indeed, these volatile and speculative investments could not satisfy the returns Norada had promised to investors and Norada began using other investor funds to pay the returns that it had promised to investors. In total, between June of 2020 and June 2024, Norada used more than $18 million of investor funds to make Ponzi-like payments to its investors.

8. Santarelli never disclosed these Ponzi-like payments to investors. In fact, after Norada began using investor funds to pay investor returns, in August 2023, Santarelli started offering investors even higher rates of return on their investment. Specifically, he offered investors a 5% bonus on top of their already promised rates

1 of return, which ranged from 12% to 17% per year.  This allowed Norada to raise an additional $10.4 million from investors that month alone, and an additional $43 million over the next ten months.

9. Norada's and Santarelli's Ponzi scheme eventually collapsed and in June 2024, Santarelli notified investors that Norada was suspending distribution payments and issuing equity in Norada in place of its debt.  By early 2025, Norada shut down entirely, causing many investors to lose their investments.

10. By engaging in this conduct, defendant Santarelli violated the securities registration provisions of Section 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77f, and the antifraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q, and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder.

11. With this action, the SEC seeks permanent injunctive relief against defendant Santarelli to prevent future violations of the federal securities laws, a conduct based injunction, disgorgement of any ill-gotten gains, along with prejudgment interest, and a civil penalty.

## THE DEFENDANT

12. Defendant Marco Santarelli ("Santarelli") is a resident of Laguna Niguel, California.  Santarelli was the sole owner of Norada Capital Management, LLC.

## RELEVANT ENTITY

13. Norada Capital Management, LLC ("Norada") was a single member Wyoming limited liability company with its principal place of business in Laguna Niguel, California.  Norada was managed solely by Santarelli and was not registered with the United States Securities Commission in any capacity.  It purportedly offered stable high yield investments to the investing public.

# THE FRAUD

## 1. Scheme To Defraud

### a. Santarelli Represented that Norada Investments were Safe and Secure

14. From its inception in 2020 until its closure in 2025, Santarelli, through Norada, offered and sold promissory notes that purportedly paid exceptionally high rates of return through its Norada Capital Fund.

15. Santarelli solicited investors in Norada through internet advertisements, as well as through podcasts and webinars Santarelli hosted wherein he discussed the various investment opportunities offered by Norada.

16. The Norada promissory notes offered rates of return that varied based upon the amount invested and fluctuated from year-to-year, ranging from 12% to 14% for investments of less than $100,000, up to 15% to 17% with a 5% bonus at maturity for investments in excess of $200,000. The high rates of return were a key selling point for many of Norada's investors.

17. Although Norada employed a few salespeople to market the notes to investors, Santarelli solely ran the company—he created and disseminated Norada's marketing materials including the weekly webinars he posted online, communicated with investors and prospective investors, and controlled the company's bank accounts.

18. According to one salesperson, Norada was a "one-man operation" run by Santarelli, who served as the source of all information provided to investors.

19. In addition to promising stable high yields to investors, Norada also claimed to provide capital preservation and that the notes were suitable for retirement accounts.

20. For example, a 2020 brochure that Santarelli provided to early investors states "[y]ou don't have to chase the unpredictable returns offered by the stock market! . . .Norada seeks high and stable income, consistent with long-term

preservation of capital."

21. Santarelli represented that the Norada notes were backed up by "hard assets and collateral" and therefore less risky than other speculative investments.

22. Santarelli pitched Norada as "IRA Friendly" to investors, providing "investors with a way to put to use their self-directed traditional IRA or Roth IRA."

23. Santarelli described Norada as "predictable income with promissory notes" and stated that the rates of return were "fixed."

24. Santarelli claimed that an investment in Norada provided investors with "predictable monthly income and double-digit returns."

25. In August 2023, a prospective investor sent Santarelli an email, asking about the likelihood of losing his investment principal, to which Santarelli replied "[s]hort of a major global event, like a black swan event, the odds are very small. Hard to put a number of (sic) it, but I'm guessing less than 2%."

26. Santarelli repeated this black swan analogy to multiple Norada investors encouraging them to invest because of the safety of the investment.

27. Santarelli's representations to investors about Norada being a safe and secure investment, or words to that effect, were material. That is, they were important to a reasonable investor in making an investment decision and significantly altered the total mix of information available to the investor.

      b. **Santarelli's Representations About Norada Were Materially False and Misleading**

28. Contrary to Santarelli's representations to investors about Norada promising higher-than-market yields, preserving investor capital, and meeting the particular needs of elderly investors seeking a fixed income, Norada invested in assets that did not meet these investment objectives and did not provide any of the safety and security that Santarelli had promised.

29. For example, in 2020, Norada's portfolio included intellectual property assets of several retailers, which had been purchased out of bankruptcy, musical

productions, approximately $5 million dollars of crypto assets held in an account at Coinbase opened in Santarelli's name and not in the name of Norada, and $1 million in real estate-related assets.

30. In late 2022 and early 2023, Santarelli entered into a $90 million debt agreement on behalf of Norada to fund the purchase of membership interests in three "Mastermind" entities for $30 million apiece from the entities' owner Collective Equity.

31. Under the terms of the deal with Collective, Norada was obligated to pay Collective Equity $1.5 million per month for five years to acquire its equity interest in the Mastermind entities.

32. The Mastermind entities that Norada contracted to buy sold business education classes at events targeting aspiring entrepreneurs featuring celebrity guest speakers from business, sports, and entertainment professions.

33. Two of the founders of Collective Equity described the Mastermind business as an inherently risky start-up venture.

34. Norada ultimately paid down more than $45 million of the debt used to fund the Mastermind purchases and received nominal returns.

35. By in or about Summer 2023, Norada still owed $45 million to Collective Equity, putting Norada in a precarious financial situation.

c. **Norada Makes Ponzi-Like Payments to Investors**

36. As a result of the debt service obligations from its investment in the Mastermind entities, Norada's incoming revenues could not keep pace with its outgoing payment obligations to investors.

37. From November 2022, when Norada first acquired its interests in Mastermind, to July 2023, Norada paid its investors returns of approximately $6.1 million more than it earned on its investments. Norada paid these returns to investors by drawing on the more than $22.6 million — roughly $2.5 million per month – from what it raised from investors during the same time period.

38. At no time was the revenue Norada generated sufficient to cover the interest payments that Norada owed its investors and its other expenses.

39. So, to generate additional revenue, in August 2023, Santarelli offered prospective investors a 5% annual bonus on new investments, even though he knew, or was reckless and negligent for not knowing, that Norada was already using investor funds to pay the returns it had promised to other investors.

40. Santarelli's offer of a 5% bonus to investors meant that Norada became obligated to pay as much as 22% per year of interest on some of the money the company raised from investors.

41. Altogether the 5% bonus allowed Norada to raise an additional $54 million from investors between in or about August 2023 and June 2024.

42. In that 11-month time span, Norada paid investor returns that exceeded investment revenues by over $10 million. This meant that existing investors receiving this over $10 million were paid not by investment revenues but through new investor money.

43. In total, between June 2020 and through June 2024, Norada used more than $18 million of investor funds to make Ponzi-like payments to other investors.

      **d. Santarelli's Scheme Collapses**

44. On or about June 20, 2024, Santarelli notified investors by email that "due to current market conditions and unforeseen financial challenges" Norada had decided to "temporarily" suspend distribution payments and to issue equity in Norada in place of its debt.

45. On or about July 8, 2024, Santarelli sent investors another email which once again placed blame for the failure to make distribution payments on "tight capital markets, slower-than-expected revenue growth . . . and the overall cash position and distribution schedules of our portfolio businesses." In this email Santarelli also informed investors that they were "now invested as an equity shareholder" in Norada.

46. Upon information and belief, Norada ceased operations in or around early 2025.

### e. Santarelli Obtained Money in Connection with the Sale of Norada's Securities

47. Santarelli obtained money in connection with the materially false and misleading statements he made to investors. Specifically, Santarelli obtained the at least $5 million in crypto assets that he held in his name in a Coinbase account.

### f. Santarelli Acted With Scienter or at Least Negligence

48. Santarelli acted with scienter in carrying out the scheme to defraud and in making the false and misleading statements to investors. Santarelli also acted negligently in carrying out his scheme and in making the false and misleading statements, that is, he failed to exercise the level of care that a reasonable person would have exercised under the same circumstances.

49. Santarelli's scienter and failure to act reasonably under the circumstances is demonstrated, in part, by the following:

   a. Santarelli invested in a risky portfolio that included intellectual property assets of several retailers, which had been purchased out of bankruptcy, musical productions, $1 million in real estate-related assets and the "Mastermind" entities.

   b. Santarelli purchased approximately $5 million dollars of crypto assets that he held in an account at Coinbase in his name and not in the name of Norada.

   c. Santarelli promised investors a 5% bonus and raised an additional $54 million from investors between in or about August 2023 and June 2024, after Norada had already begun using investor funds to pay returns.

### 2. The Notes Santarelli Offered to Investors Are Securities

50. The Norada promissory notes Santarelli offered to investors are securities.

51. Each investor invested money in a common enterprise, namely the

COMPLAINT                                                8

Norada investments, with the expectation of profit in the form of interest payments that were to be derived from the efforts of others.

52. Investors in the Norada Capital Fund expected to receive interest payments of between 12% and 17%, which far exceeded the rates available on traditional and more conservative retirement investments.

53. Santarelli, through Norada, marketed, offered and sold the notes through the internet, webinars, and podcasts disseminated to hundreds of investors nationwide.

54. A reasonable investor would consider the Norada notes to be securities.

55. Norada's notes were not insured or collateralized, and no alternative regulatory scheme regulates the notes.

56. Investors purchased the notes with the same type of consideration by providing money which was then pooled into Norada's bank accounts.

57. The success of Norada's Capital Fund investments was attributable to the overall performance of its investments, and those risks and rewards were shared on a pro rata basis by the investors.

58. Santarelli had the ability to choose all of the investment opportunities in which to invest including choosing particular retailers, particular musicals, and particular Mastermind classes so as to create a profit margin that it could share with Norada investors.

59. If Norada profited, then Santarelli and the investors would also profit.

60. Investors in the Norada Capital Fund were entirely passive and dependent on Santarelli, who controlled Norada.

### 3. Santarelli Conducted Unregistered Offering

61. The offering sold by Santarelli through Norada was not registered with the Commission.

62. The notes sold by Santarelli through Norada were offered and sold through interstate commerce to investors in multiple states.

63. No exemptions to registration under the federal securities laws applied to the note offering sold by Santarelli through Norada.

64. At least two investors who purchased the notes sold by Santarelli through Norada were not accredited investors.

65. The notes sold by Santarelli through Norada exceeded $10 million in value.

66. Santarelli used general solicitation, including online advertisements, webinars, YouTube videos and podcasts to offer and sell securities to investors in Norada.

## FIRST CLAIM FOR RELIEF

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendant Santarelli)**

67. The SEC realleges and incorporates by reference paragraphs 1 through 66 above.

68. In connection with the purchase or sale of securities, Defendant Santarelli employed deceptive acts and practices, and engaged in a course of conduct to deceive investors in his offer and sale of Norada's securities. He did so by making interest payments to investors that were financed with other investors' capital, falsely creating an appearance of profitability. In addition, Defendant Santarelli, in his solicitations to investors, made materially false and misleading statements to investors about the safety and security of Norada's investments when in reality, Norada's investment portfolio was almost exclusively comprised of non-stable highly speculative business ventures.

69. By engaging in the conduct described above, Defendant Santarelli, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to

1 defraud; (b) made untrue statements of a material fact or omitted to state a material
2 fact necessary in order to make the statements made, in the light of the circumstances
3 under which they were made, not misleading; and (c) engaged in acts, practices, or
4 courses of business which operated or would operate as a fraud or deceit upon other
5 persons.

6     70. Defendant Santarelli, with scienter, employed devices, schemes and
7 artifices to defraud; made untrue statements of a material fact or omitted to state a
8 material fact necessary in order to make the statements made, in the light of the
9 circumstances under which they were made, not misleading; and engaged in acts,
10 practices or courses of conduct that operated as a fraud on the investing public by the
11 conduct described in detail above.

12     71. By engaging in the conduct described above, Santarelli violated, and
13 unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange
14 Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17
15 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

**Fraud in the Offer or Sale of Securities**

**Violations of Section 17(a) of the Securities Act**

**(against Defendant Santarelli)**

20     72. The SEC realleges and incorporates by reference paragraphs 1 through
21 66 above.

22     73. In connection with the offer or sale of securities, Defendant Santarelli
23 employed deceptive acts and practices, and engaged in a course of conduct to deceive
24 investors in his offer and sale of Norada's securities. He did so by making interest
25 payments to investors that were financed with other investors' capital, falsely creating
26 an appearance of profitability. In addition, Defendant Santarelli, in his solicitations to
27 investors, made materially false and misleading statements to investors about the
28 safety and security of Norada's investments when in reality, Norada's investment

portfolio was almost exclusively comprised of non-stable highly speculative business ventures.

74. By engaging in the conduct described above, Defendant Santarelli, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

75. Defendant Santarelli, with scienter, employed devices, schemes and artifices to defraud; with scienter or negligence, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and, with scienter or negligence, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

76. By engaging in the conduct described above, Defendant Santarelli violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

### THIRD CLAIM FOR RELIEF

**Unregistered Offer and Sale of Securities**

**Violations of Sections 5(a) and 5(c) of the Securities Act**

**(against Defendant Santarelli)**

77. The SEC realleges and incorporates by reference paragraphs 1 through 66 above.

78. The Norada offering involved the offering of securities in the form of promissory notes.

79. The Norada offering was never registered with the SEC, and no exemptions from the registration requirements applied to it.

80. By engaging in the conduct described above, Defendant Santarelli, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of sale or for delivery after sale, when no registration statement had been filed or was in effect as to such securities, and when no exemption from registration was applicable.

81. By engaging in the conduct described above, Defendant Santarelli violated, and unless restrained and enjoined, are reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) & 77e(c).

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendant Santarelli committed the alleged violations.

### II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Santarelli and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), §77q(a)], and Section 10(b) of the

Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Santarelli from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer; provided, however, that such injunction shall not prevent Santarelli from purchasing or selling securities for his own personal account.

### IV.

Order Defendant Santarelli to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

### V.

Order Defendant Santarelli to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: October 20, 2025

                                    */s/ Kathryn C. Wanner*
                                    KATHRYN C. WANNER
                                    Attorney for Plaintiff
                                    Securities and Exchange Commission